# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | |
|---|---|
| NORTH JACKSON PHARMACY, INC., <br><br> Plaintiff, <br><br> v. <br><br> MCKESSON CORPORATION, <br><br> Defendant. | Case No.: 5:14-cv-02371-SGC |

## MEMORANDUM OPINION[1]

This matter was removed from the Circuit Court of Jackson County, Alabama, on December 9, 2014. (Doc. 1). On August 24, 2015, the court denied the motion to remand filed by the plaintiff, North Jackson Pharmacy, Inc. ("NJP"), and ordered that Tom Smith be dismissed from this action as fraudulently joined. (*See* Doc. 33). This matter is now before the court on the motion for summary judgment filed by the remaining defendant, McKesson Corporation ("McKesson"). (Doc. 52). The motion is fully briefed and ripe for review. (Docs. 53, 57, 60). As explained below, the motion is due to be granted.

---

[1] The parties have previously consented to the exercise of dispositive jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c). (Doc. 19).

I.   FACTS

NJP is an independent pharmacy located in Stevenson, Alabama, owned and operated by Bryan Hicks. (Doc. 57 at 4). McKesson is a pharmaceutical supplier. (*See id.*). McKesson supplied prescription drugs to NJP for approximately ten years prior to December 2014. (*See id.*). NJP asserts claims for breach of contract and tortious interference with business relations against McKesson arising from McKesson's December 3, 2014 termination of its relationship with NJP. (Doc. 1-1 at 6-8).

The contract in question is a vendor agreement (the "Agreement") between McKesson and the American Pharmacy Cooperative, Inc. ("APCI"), of which NJP is a member. (*See generally* Doc. 57-1). The version of the Agreement governing at the time of McKesson's termination was executed by McKesson and APCI in May 2013, and is governed by Alabama law. (*Id.* at 2, 26). Under the Agreement, McKesson was the exclusive supplier of products for APCI's members. (Doc. 57-1 at 4). Paragraph 40 of the Agreement, entitled "Controlled Substance Requirements," provides:

> Nothing in this Agreement shall be construed as requiring McKesson to perform any obligations hereunder or engage in any action or omission that McKesson reasonably determines as violating any applicable federal, state or local law, rule, regulation or government requirement ("Laws") or putting McKesson in jeopardy of violating any such Laws. . . . In the event that performance of the terms of this Agreement would cause McKesson to be noncompliant with or in jeopardy of being noncompliant with any Laws or any governmental

> guideline or pronouncement involving Controlled Substances . . . including the Drug Enforcement Administration's regulatory requirements for verifying its customers and reporting suspicious or excessive orders, McKesson shall have the right, within its sole and absolute discretion, to do any of the following with respect to any APCI Member: (A) limit or deny any order for Controlled Substances or other regulated products as warranted by any established diversion monitoring program of McKesson; and/or (B) immediately terminate this Agreement, in whole or in part, as to an APCI Member without liability if: (i) continued performance of any part of this Agreement with respect to an APCI Member would . . . put McKesson in jeopardy of violating any Laws regarding Controlled Substances or any other regulated products or activities . . . .

(*Id.* at 32).

On October 15, 2014, Chris Sanderson, a manager in McKesson's regulatory affairs department, visited NJP and later prepared a report regarding its pharmacists and disbursement of controlled substances. (*See* Doc. 1-3 at 4-10). After reviewing the report, Jerry Carmack, also in McKesson's regulatory affairs department, prepared a report recommending termination of McKesson's relationship with NJP. (*Id.* at 1-3). After citing aspects of NJP's practices, discussed in more detail below, Carmack's report concluded NJP was not performing its duties under federal law regarding disbursement of controlled substances. (*Id.*).

Gary Boggs, McKesson's senior director of regulatory compliance, was employed as a Special Agent with the Drug Enforcement Administration ("DEA") from 1985 to 2012, and was assigned to the Office of Diversion Control for the last

six years of his employment by the DEA. (Doc. 54-3 at 2-3). Boggs reviewed Sanderson's and Carmack's reports, as well as NJP's purchasing data, and—based on numerous "red flags"—made the decision to "suspend any further supply" of controlled substances to NJP. (*Id.* at 4-6). Sanderson's and Carmack's reports noted: (1) the disciplinary record of three NJP pharmacists, one of which "was caught taking and consuming pain pills while working as a pharmacist"; (2) approximately 30% of NJP's total prescription sales were paid in cash; (3) NJP's failure to utilize the state's voluntary prescription drug monitoring program; and (4) over 45% of the prescriptions dispensed by NJP during the previous six months were for controlled substances. (*Id.* at 4). The reports also noted the relatively high volume of controlled substances dispensed by NJP, including: (1) two standard deviations above the mean for morphine and oxycodone doses: (2) three standard deviations above the mean for alprazolam; (3) more than four standard deviations above the mean for hydrocodone, 76.3% of which was dispensed in the higher 10 mg dosage; and (4) NJP's purchase of 1,268,000 doses of phendimetrazine in 2014, which was more than 1000 times the threshold established by McKesson. (*Id.* at 4-5). Finally, the reports noted red flags regarding NJP's filling of phendimetrazine prescriptions written by the Cumberland Center, a weight loss clinic located next door to NJP. In particular, the reports noted the Cumberland Center employed physicians that had been disciplined by

licensing boards in Alabama or Tennessee for "improper prescribing of controlled substances." (*Id.* at 4). The reports also noted the suspicion that the Cumberland Center was prescribing phendimetrazine—which is illegal in Tennessee—to Tennessee residents who filled their prescriptions at NJP and paid in cash. (*Id.*).

Based on the red flags revealed by NJP's purchasing data and identified in Carmack's and Sanderson's reports, Boggs decided to suspend any further delivery of controlled substances to NJP. (Doc. 54-3 at 5-6). Boggs made this decision "because of a concern that a continued performance of the Agreement as to NJP would violate laws regarding controlled substances, or could put McKesson in jeopardy of violating laws regarding controlled substances." (*Id.* at 6). During his deposition, Boggs testified that NJP's "inability to appropriately exercise" its responsibility under 21 C.F.R. § 1306.04 put McKesson at risk of violating its requirement to maintain effective controls against diversion under 21 U.S.C. § 823. (Doc. 56-4 at 42).

McKesson's Dale Harris relayed the termination to NJP via a telephone call to Bryan Hicks on December 3, 2014. (*See* Doc. 57 at 5). Harris stated McKesson was terminating the Agreement due to the ratio of controlled to non-controlled pharmaceutical orders, the amount of cash sales, and concerns about the number of prescriptions written by the Cumberland Center. (*See id.*). During his deposition, Hicks testified that NJP was never in violation of any law, rule, or regulation

5

governing pharmacy practices. (*Id.* at 36). Hicks further testified that McKesson never warned NJP that it could be in possible violation of any rule, regulation, or law prior to termination. (*Id.*). Finally, Hicks testified there was a "linked" business relationship between NJP, its customers, and McKesson. (*See* Doc. 53 at 17).

## II. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). When considering a summary judgment motion, the court must view the evidence in the record in the light most favorable to the non-moving party. *Hill v. Wal-Mart Stores, Inc.*, 510 F. App'x 810, 813 (11th Cir. 2013). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

## III. DISCUSSION

NJP's claims for breach of contract and tortious interference with business relations are discussed in turn.

### A. Breach of Contract

To prevail on a claim for breach of contract under Alabama law, a plaintiff must show: "(1) the existence of a valid contract binding upon the parties in the action, (2) the plaintiff's own performance, (3) the defendant's nonperformance, or breach, and (4) damage." *Armstrong Business Services, Inc. v. AmSouth Bank*, 817 So. 2d 665, 673 (Ala. 2001). A contract provision giving a party "sole discretion" amounts to the "absolute reservation of a right." *See Shoney's LLC v. MAC East, LLC*, 27 So. 3d 1216, 1220 (Ala. 2009). As explained below, NJP's claim for breach of contract fails because it cannot demonstrate McKesson's breach.

Unsurprisingly, McKesson's arguments regarding the breach of contract claim rely heavily on the terms of Paragraph 40, which gave it sole and absolute discretion to terminate the Agreement if NJP's conduct could place McKesson in jeopardy of regulatory non-compliance. McKesson asserts its termination of the Agreement does not amount to a breach because it determined, within its "sole discretion" and pursuant to Paragraph 40, that NJP's conduct placed McKesson at risk of regulatory noncompliance. (Doc. 53 at 13-14; Doc. 60 at 5-10). Although McKesson contends the Agreement does not impose a reasonableness requirement

on the determination regarding risks of regulatory noncompliance, McKesson further argues its decision to terminate was reasonable. (Doc. 60 at 9).

In general terms, NJP's opposition contends McKesson's termination was unreasonable and violated the Agreement's terms regarding notice and termination. Regarding reasonableness, NJP argues it never placed McKesson in danger of regulatory non-compliance and that McKesson used improper and/or unknown methods to determine the ratio of controlled to non-controlled substances it dispensed. (Doc. 57 at 11-17). The arguments are addressed in turn.

### 1. Notice and Termination

As to the Agreement's provisions regarding notice and termination, NJP points to paragraphs 3 and 28 of the Agreement and contends it was entitled to written notice and an opportunity to cure any deficiencies. (Doc. 57 at 11-14). (Doc. 57 at 7, 11-12). Paragraph 28 provides that notices of certain actions must be delivered to specified parties in writing. ([Doc. 57-1 at 26-27). However, individual APCI members, like NJP, are not parties entitled to notice under Paragraph 28. (*Id.*). Accordingly, to the extent NJP relies on Paragraph 28, its arguments fail.

Paragraph 3 does impose duties on McKesson to provide APCI members with written notice of material breaches and an opportunity to cure. (Doc. 57-1 at 6-7). However, the breaches contemplated under Paragraph 3 include a member's

8

failure to make timely payments, declaration of bankruptcy, or appointment of a receiver. (*Id.* at 7). In contrast to Paragraph 3's notice requirements concerning fiscal issues, Paragraph 40 grants McKesson the sole and absolute discretion to terminate the entire Agreement "immediately" and "without liability." (Doc. 57-1 at 32). Indeed, Paragraph 40 contemplates a unilateral and immediate termination of the Agreement in the event a member pharmacy's conduct is deemed to create a risk of legal noncompliance. Accordingly, the court finds nothing in Paragraph 3 which raises a dispute as to whether McKesson violated the Agreement's provisions regarding notice and termination.

### 2. Reasonableness

The parties disagree regarding whether the Agreement imposed a reasonableness requirement on McKesson's determination that NJP's practices created a risk of regulatory noncompliance. NJP contends the Agreement required McKesson to act reasonably in determining termination was appropriate under Paragraph 40, while McKesson contends it had sole and absolute discretion regarding this determination. McKesson is entitled to summary judgment on the breach of contract claim in either event. As explained in more detail below: (1) to the extent Paragraph 40 gave McKesson the sole and absolute discretion to determine a termination under Paragraph 40 was appropriate, McKesson is entitled to judgment as a matter of law; and (2) to the extent Paragraph 40 required a

reasonable determination that NJP's practices placed McKesson in jeopardy of regulatory noncompliance, McKesson acted reasonably.

NJP argues genuine issues of material fact regarding the reasonableness of McKesson's termination of the Agreement preclude summary judgment. (Doc. 57 at 12, 14-16). The first sentence of Paragraph 40 does include the word "reasonably" in the following context:

> Nothing in this Agreement shall be construed as requiring McKesson to perform any obligations hereunder or engage in any action or omission that McKesson reasonably determines as violating any applicable federal, state or local law, rule, regulation or government requirement ("Laws") or putting McKesson in jeopardy of violating any such Laws.

(Doc. 57-1 at 32). However, the sentence contemplating termination of the Agreement does not explicitly incorporate a reasonableness requirement:

> In the event that performance of the terms of this Agreement would cause McKesson to be . . . in jeopardy of being noncompliant with any Laws or any governmental guideline . . . including the Drug Enforcement Administration's regulatory requirements for verifying its customers and reporting suspicious or excessive orders, McKesson shall have the right, within its sole and absolute discretion, to . . . (B) immediately terminate this Agreement, in whole or in part, as to an APCI Member without liability if: (i) continued performance of any part of this Agreement with respect to an APCI Member would . . . put McKesson in jeopardy of violating any Laws regarding Controlled Substances or any other regulated products or activities.

(*Id.*).

McKesson notes that the portion of Paragraph 40 providing for termination reserves McKesson's sole and absolute discretion to immediately terminate the

Agreement without liability. Accordingly, McKesson contends that imposing a reasonableness requirement would be inconsistent with its sole and absolute discretion to terminate due to regulatory compliance issues. (Doc. 60 at 8-9). To the extent McKesson's interpretation of Paragraph 40 is correct, it is entitled to summary judgment under Alabama law. *Shoney's LLC*, 27 So. 3d at 1220 ("sole discretion" amounts to the "absolute reservation of a right").

As NJP would have it, Paragraph 40 requires McKesson to act reasonably in determining a risk of regulatory non-compliance. NJP takes issue with McKesson's factual determinations regarding NJP's practices and points to supposed inconsistencies regarding the reasons McKesson gave for terminating the Agreement. (Doc. 57 at 11-16). NJP also contends genuine issues of material fact preclude summary judgement because information regarding the formula McKesson employed to calculate the ratio of controlled to uncontrolled pharmaceuticals does not appear on the record. (Doc. 57 at 17). These arguments are addressed in turn.

First, NJP takes issue with McKesson's determination that it was in jeopardy of regulatory non-compliance. These arguments essentially dispute the facts McKesson cited in making this determination and rely on NJP's contentions that it: (1) was in compliance with all applicable laws and regulations; (2) employed licensed pharmacists acting within their authority; (3) legitimately accepted cash

11

payments for prescriptions; (4) has, since termination, begun to participate in voluntary state prescription drug monitoring programs; and (5) faced no regulatory issues, inquiries, or violations. (Doc. 57 at 14-16).

Even accepting NJP's reading of Paragraph 40 as requiring McKesson to act reasonably, the key question would be whether McKesson reasonably determined NJP's practices placed it in jeopardy of regulatory noncompliance. Gary Boggs terminated the Agreement, concluding NJP's practices placed McKesson in jeopardy of violating 21 C.F.R § 1306.04 and 21 U.S.C. § 823. (Doc. 54-3 at 5-6). While NJP asserts McKesson's findings do not amount to regulatory violations— and that NJP never violated any laws or regulations or faced regulatory inquiries— Paragraph 40 requires only *potential* regulatory non-compliance. Moreover, NJP offers no evidence to show that McKesson's decision to terminate the Agreement was unreasonable, especially in light of the myriad issues identified by Boggs in determining NJP failed to "maintain effective controls against diversion." (Doc. 56-4 at 42). Accordingly, to the extent NJP attacks McKesson's determinations regarding the risk of regulatory noncompliance, its arguments miss the mark.

Next, NJP contends McKesson offered varying rationales for terminating the Agreement; it argues these inconsistencies create genuine issues of material fact. (Doc. 57 at 12-13, 16-17). In particular, NJP points to the reasons for McKesson's termination offered by: (1) Dale Harris during the December 3, 2014 telephone

call; and (2) the deposition testimony of Gary Boggs, McKesson's regional Director of Compliance and Regulatory Affairs. (*See* Doc. 57 at 12-13). Dale Harris told Bryan Hicks that McKesson was terminating the Agreement due to the ratio of controlled to non-controlled pharmaceutical orders, the amount of cash sales, and concerns about the number of prescriptions written by the Cumberland Center. (*See id.*). Meanwhile, Gary Boggs testified the Agreement was based on "regulatory jeopardy." (*Id.*). NJP fails to explain how Dale Harris's statements are inconsistent with the testimony of Gary Boggs. Moreover, the court can discern no inconsistency.

Finally, NJP contends a genuine issue of material fact exists because information regarding the formula McKesson used to determine the ratio of controlled to non-controlled pharmaceuticals is "completely unknown." (Doc. 57 at 17). In advancing this argument, NJP relies on the deposition of Dale Harris, in which he testified that he was unaware of the formula used to determine the ratio. (*Id.*). The absence in the record of a specific formula McKesson employed cannot be used to create a genuine issue of material fact here, where McKesson has presented evidence that its termination of the Agreement was proper. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

McKesson has presented evidence that a review of NJP's practices revealed a number of red flags regarding compliance with laws and regulations pertaining to

controlled substances. While the undersigned has not located a precise formula used to calculate the ratio of controlled to uncontrolled substances, the sealed deposition of Gary Boggs contains information regarding the review process and analyses McKesson employed. (Doc. 54-4). NJP has not presented any evidence to contradict the facts—whether included in Sanderson's and Carmack's reports or gleaned from NJP's purchasing history—Boggs relied on in deciding to terminate the Agreement. Nor did NJP move to compel production of any formula prior to the discovery deadline or move for additional discovery following McKesson's motion for summary judgment. Under the circumstances of this case, NJP must present evidence to overcome McKesson's properly supported motion; NJP cannot create a genuine issue of material fact by pointing to the formula's non-appearance in the record. Moreover, even if the absence of the formula McKesson used to determine the ratio of controlled to non-controlled substances could create a factual question, NJP has not presented any evidence to refute the other areas of concern identified by McKesson as justifying termination under Paragraph 40.

For all of the foregoing reasons, there are no genuine issues of material fact and McKesson is entitled to judgment as a matter of law on NJP's claim for breach of contract.

## B. Tortious Interference With Business Relations

Under Alabama law, a plaintiff claiming tortious interference with contractual or business relations must show: "(1) the existence of a protectible business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage." *White Sands Group, LLC v. PRS II, LLC,* 32 So. 3d 5, 14 (Ala. 2009).[2] As relevant here, "a plaintiff asserting a tortious-interference claim bears the burden of proving that the defendant is a 'third party' or 'stranger' to the contract or business relationship with which the defendant allegedly interfered." *Waddell & Reed, Inc. v. United Investors Life Ins. Co.,* 875 So. 2d 1143, 1154 (Ala. 2003). An entity is not a stranger if it is a "participant" in a relationship. *Id.* at 1157. A participant is one involved "in a business relationship arising from interwoven contractual arrangements that include the contract." *Id.* A plaintiff claiming tortious interference must show not only a defendant's distance from the contract but also distance from "the business relationship giving rise to and underpinning the contract." *Id.* at 1154-55 (emphasis omitted) (*quoting Atlanta Mkt. Ctr. Mgmt. Co. v. McLane,* 503 S.E.2d 278, 283 (Ga. 1998).

---

[2] The tort of tortious interference with business relations substantially overlaps with tortious interference with contractual relations. *Glenn Const. Co., LLC v. Bell Aerospace Servs., Inc.*, 785 F. Supp. 2d 1258, 1279 (M.D. Ala. 2011); *Hope for Families & Cmty. Serv. v. Warren,* 721 F. Supp. 2d 1079, 1177 (M.D. Ala. 2010) (explaining that tortious interference with a business relationship is a separate tort from tortious interference with a contractual relationship because the latter "presupposes the existence of an enforceable contract but that otherwise, the elements of both torts overlap") (quotations and alterations omitted).

The Alabama Supreme Court has stated that "[a] defendant is a party in interest to a business or contractual relationship if the defendant has any beneficial or economic interest in, or control over, that relationship." *Tom's Foods, Inc. v. Carn,* 896 So. 2d 443, 454 (Ala. 2004)). Additionally, "[p]arties to an interwoven contractual arrangement are not liable for tortious interference with any of the contracts or business relationships." *Waddell,* 875 So. 2d at 1157 (emphasis omitted) (quoting *LaSonde v Chase Mortg. Co.,* 777 S.E.2d 822, 824 (Ga. App. Ct. 2003)). Furthermore, a third-party "involved in creating th[e] relationship" between two other parties is not a stranger to that relationship. *Tom's Foods,* 896 So. 2d at 455.

The Eleventh Circuit has recognized the Alabama Supreme Court's enumeration of several circumstances in which a party is not a stranger for purposes of tortious interference. *MAC East, LLC v. Shoney's*, 535 F.3d 1293, 1297 (11th Cir. 2008).

> A defendant is not a "stranger" to a contract or business relationship when: "(1) the defendant is an essential entity to the purported injured relations; (2) the allegedly injured relations are inextricably a part of or dependent upon the defendant's contractual or business relations; (3) the defendant would benefit economically from the alleged injured relations; or (4) both the defendant and the plaintiff are parties to a comprehensive interwoven set of contract relations."
>
> *Id.* (quoting *Waddell,* 875 So. 2d at 1156).

Here, McKesson asserts it was not a stranger to NJP's business relationship with its customers because: (1) McKesson was essential to the relationship; (2) the injured relationship was dependent on the relationship between McKesson and NJP; and (3) McKesson and NJP are parties to a comprehensive and interwoven set of relations. (Doc. 53 at 15-18). The undisputed facts support all of McKesson's contentions. Indeed, NJP's corporate representative testified there was a "linked" business relationship between NJP, its customers, and McKesson. (*Id.* at 17). Moreover, NJP has not presented any evidence contradicting the facts offered by McKesson and has not responded to McKesson's legal arguments regarding the tortious interference claim. (*See generally* Doc. 57).

For the foregoing reasons, there are no general issues of material fact and McKesson is entitled to judgment as a matter of law regarding the claim for tortious interference with business relations.

## IV. CONCLUSION

For all of the foregoing reasons, there are no genuine issues of material fact and McKesson is entitled to judgement as a matter of law on the claims asserted in this matter. A separate order will be entered.

**DONE** this 12th day of October, 2017.

*[signature]*
STACI G. CORNELIUS
U.S. MAGISTRATE JUDGE